GERTRUDE C. RHODES, respondent,

*v.*

ALBERT A. RHODES, appellant.

[Decided October 21st, 1920.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Lane, who filed the following opinion:

"At the conclusion of the case I orally expressed my conclusions on the facts. Upon reflection I see no reason to change them. I shall not reiterate them except in so far as may be necessary to indicate the reasons which have led me to the final determination.

"The couple were married July 29th, 1915. Complainant was nineteen years old; the husband was thirty. He had two children—girls—now ten and eleven years old respectively. His prior wife had been divorced by him on the ground of adultery and is still living. At the time of the marriage his mother was living with him. The courtship of the parties was extremely short. His mother was adverse to the marriage. The wife was of a passionate disposition, loved children and was desirous of having children of her own. The husband, although enjoying a good income, yet, in part, at least, for financial reasons, desired no children. Complainant was placed in a most difficult position. Within a week after the marriage the mother-in-law left the house and for nine months thereafter the husband did not see his mother. The difficulties which arose between the mother and the wife I have found were due to the acts of the mother. Complainant performed her duties in a creditable manner and took extremely good care of defendant's children by the prior marriage. On October 29th, 1915, complainant was induced by defendant, against her protest, to submit to an abortion, which was performed by an unskilled individual. In July, 1916, com-

plainant was again induced by her husband to submit to an abortion, which this time was performed by a physician. She was some eighteen hours in labor and almost lost her life. In the spring or summer of 1917 complainant again being pregnant her husband endeavored to induce her to submit to another abortion. I have found that defendant made the statement, which it is alleged he made to the father of complainant, upon being told by the father that there would be trouble if there was another abortion, that maybe he could get her to get rid of it on her own account. The child of the marriage was born on November 22d. On December 3d complainant returned home and remained with defendant until April 29th, 1918, when she left him. On two prior occasions complainant had left the home, once on November 20th, 1915, as a result of a quarrel, in which defendant told petitioner if she was not satisfied she could get to hell out of there. She returned upon her husband begging her to return and promising her to treat her in a different manner. In February, 1917, upon the return to her home with her husband from her father's house, he being intoxicated, or partly intoxicated, cursed and swore at her, ordered her out of bed, called her a God damn hypocrite, God damn bastard, God damn son of a bitch. He stated to her that he would have her where he wanted her in six months or know the reason why. Upon her remonstrance he continued his abusive language, and finally told her when she said she wouldn't stay, to get out, and the quicker the better; she left and went to her father's house. The husband went to her again and begged her forgiveness and promised to treat her as a husband should if she would return, which she did. The quarrel which led to the separation on April 29th, 1918, arose because of the insistence on the part of the husband that he would spend every other Sunday at his mother's, leaving his wife and children alone; words led to more words, until finally the husband made a remark which reflected upon the chastity of complainant, which enraged her to such an extent that she slapped his face, whereupon he accused her of being a lunatic and left the house with the avowed purpose of getting a physician. She telephoned her father, who came to the house. While the father and complainant were packing up, the hus-

band returned and again left, as he says, with the intention of getting a physician. The father and complainant left before he returned and complainant has been with her parents ever since. No *bona fide* effort has been made by the husband to induce the wife to return to him. There has been no physical violence on the part of the defendant aside from the illegal abortions. While the quarrels, as I find, have been the fault of the husband and indicate a lack of due consideration for complainant, under ordinary circumstance and standing alone, the conduct of the defendant would not be sufficient to justify separate maintenance. This court cannot regulate in such minute details the conduct of husband and wife. But, in this case, the wife, a mere girl, has been induced by the husband, a mature man, to submit already to two illegal abortions, defined by our statute as high misdemeanors. The law is generous with respect to the position of the woman in such cases. It is almost universally recognized that, although the woman consent, yet she is not an accomplice. She is generally regarded as the victim rather than a perpetrator of the crime. *1 Rul. Cas. L. tit. "Abortion"* § 4. In this case she was, in fact, the victim. She submitted to the abortions against her will to retain the love of her husband. He endeavored to get her to consent to a third abortion. His attitude has in nowise changed. He is not now desirous of having children. If the wife resume matrimonial intercourse with him she must do it with the knowledge that if she became pregnant her husband will desire her to submit to another abortion. It seems to me to compel a woman to live with a man under such circumstances cannot but render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife within the language of Vice-Chancellor Leaming in the case of *Walsh* v. *Walsh,* affirmed by the court of errors and appeals (*88 N. J. Eq. 368*), and such an act would be extreme cruelty on the part of the court. It is true that acts of cruelty may be condoned, but the condonation is but provisional. It seems to me that the conduct of the husband since the last abortion, and his attitude at the present time, is such that in this case the acts of abortion may be considered. At the close of the trial, without reasonable justification, defendant charged

complainant with being engaged to another man and with wearing his engagement ring. The husband's mother circulated stories to the effect that the wife had been unchaste prior to the marriage. Petitioner now is engaged as a yeoman in the service of the United States. She receives a salary in excess of $100 a month. She has been receiving by the decree of this court $15 a week. It is earnestly urged that she should be denied separate maintenance, or at least the determination of this case should be withheld until after the war is over and she loses her position as yeoman in order that it may be ascertained whether the loss of her income may not change her mind as to here attitude towards her husband. In other words, whether she may not be forced back to her husband for monetary reasons. I agree with what Vice-Chancellor Leaming said in the *Walsh Case* that it is the duty of the court to carefully limit the order to the demands of necessity as discerned by the condition and station in life of complainant and the ability of defendant to pay, and that the award of an amount calculated to render separation attractive to complainant is unwarranted by a statute that favors cohabitation and contemplates only suitable support and maintenance during the period of separation. But I deny that the court should so act as to force a woman to return to a man from sheer necessity for money. The award should not be such as to make the separation attractive nor should it be such as to make cohabitation a necessity. Where the facts warrant a separation, I think the will should be left, as near as may be, unrestrained by monetary considerations.

"I have concluded in this case to grant a decree of separate maintenance and decree may be settled on two days' notice and the amount of alimony then fixed.

"There are numerous circumstances, some of which are not apparent from the printed record, which have led me to take the story of the wife rather than that of the husband.

"The wife and her witnesses testified freely; they had made affidavits several months before upon the application for temporary alimony. They were not shaken on cross-examination, and there is no substantial divergence between the stories they tell on the stand and the stories they tell in their affidavits.

They impressed me favorably as witnesses. The husband, on the contrary, testified hesitatingly. His witnesses exhibited a spirit of venom toward complainant and a desire to do her as much injury as possible, irrespective of the truth. In their affidavits they made much broader charges against the complainant than they testified to. The husband permitted such charges to be made against his wife as made by one witness that she had appeared dressed immodestly in a bathroom, on one occasion when the husband was present and on another occasion when the children were present, an allegation I have found to be without reasonable justification, and which is in line with the charge made by the husband at the conclusion of the hearing that his wife was engaged to marry another man. The husband's absolute impassive attitude throughout the trial, as well as demeanor upon the stand, impressed me most unfavorably."

*Messrs. Lambert & Stewart,* for the respondent.

*Mr. Frank E. Bradner,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Lane.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD. PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER, ACKERSON—15.

*For reversal*—None.